UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EMPLOYERS INSURANCE OF WAUSAU,

    Plaintiff/Counter-Defendant,

v.

McGRAW-EDISON COMPANY,

    Defendant/Counter-Plaintiff,

and

UNITED STATES FIRE INSURANCE
COMPANY, *et al.*,

    Additional Counter-Defendants.

_____/

CASE NO. 4:86-CV-48

HON. ROBERT J. JONKER

## OPINION

### INTRODUCTION

Wausau filed this insurance coverage action in 1986. The action ultimately involved 75 insurance policies issued by multiple insurance companies, and multiple contaminated industrial sites once owned and operated by McGraw-Edison Company. In December 1989, the parties entered into a Settlement Agreement and Release (the "Settlement Agreement), and the Court incorporated the Settlement Agreement into its order of dismissal. (Coffey aff., docket # 343, Exs. 9, 15.) This was the same year that English scientist Tim Berners-Lee invented the World Wide Web. Now, 25 years later, people rarely use the term "World Wide Web." Rather, they refer simply to "the web,"

x

or "W3," or "the internet."[1]  A very similar phenomenon returns the settling parties to this Court to determine whether shorthand references agencies and parties are using today refer to a site the parties described in their Agreement 25 years ago, or to something different.

The fundamental disagreement between the parties is over the scope of the release in the Settlement Agreement, and in particular whether it covers a contaminated site at issue in a separate proceeding underway in Essex County, New Jersey (the "New Jersey lawsuit").  In the New Jersey lawsuit, Cooper Industries – the successor to McGraw-Edison – seeks insurance coverage for contamination of the Passaic River in the Newark area that the USEPA claims McGraw-Edison caused with discharges from two battery plants in the area.  The insurance companies say any potential coverage for this contamination was released in the Settlement Agreement. Cooper Industries disagrees and argues that at least some of the contamination at issue falls outside the scope of the release in the Settlement Agreement.

The parties have submitted a variety of motion papers framing the issue.  The Court is satisfied that it can rule on the scope of the release as a matter of law on the present record.  The Court finds no genuine issues of material fact, and concludes that one thing has not changed since 1989: namely, the parties' intention to resolve permanently and to release for all time potential McGraw-Edison insurance coverage claims for contamination arising out of the two battery plants McGraw-Edison used to operate in the Bloomfield, New Jersey area, and from which the USEPA now claims McGraw-Edison contributed to contamination in the Lower Passaic River.  Accordingly, the Court will grant the carriers' motions and deny Cooper's motions.

---

[1] The internet is technically different from the World Wide Web, but that doesn't stop people from using the terms interchangeably.

**BACKGROUND FACTS**

The USEPA alleges that "the two battery manufacturing facilities located at Belleville Avenue and Sherman Avenue in Bloomfield, New Jersey . . . and 75 Belmont Avenue in Belleville, New Jersey" formerly owned and operated by McGraw-Edison contributed to contamination of the Lower Passaic River. (Coffey aff., docket # 343, Ex. 10). These two battery manufacturing facilities sit within a larger parcel described in the USEPA action as the Silver Lake site.[2] McGraw-Edison, and predecessor Thomas Edison, Inc., historically operated primary and storage battery divisions, an active materials division, and other ancillary operations on the Silver Lake site. (*Id.*, Exs. 2-7.)[3] McGraw-Edison sold the assets of the storage battery division to Electric Storage Battery Company in 1960. McGraw-Edison transferred the primary battery division to a company called Battery Products, Inc. in 1985. Cooper acquired the stock of McGraw-Edison in 1985. The USEPA is now demanding that Cooper take responsibility for contamination McGraw-Edison caused from its battery plant facilities.

The Settlement Agreement covers 75 separate insurance policies listed in Exhibit A to the Agreement. With respect to these policies, the parties to the Agreement focused on "five sites at which McGraw-Edison operated plants or facilities or utilized a nearby landfill to dispose of waste materials, specifically the sites located in . . . Bloomfield, New Jersey [among other places outside

---

[2]The EPA at times refers to one plant as the "Bloomfield Site" and to the other as the "Belleville Site." These designations are potentially misleading, because each of the two sites straddles the towns of Bloomfield and Belleville. More importantly, as discussed below, the parties to the Settlement Agreement used the general designation of "Bloomfield" as shorthand for the phrase "McGraw-Edison Battery Products Plant facility located in Bloomfield, New Jersey," to describe one of the released sites. Municipal boundaries and designations are not coterminous with operational sites and facilities.

[3]Thomas Edison, Inc. merged with McGraw Electric in 1957, creating McGraw-Edison.

New Jersey]." (*Id.*, Ex. 9, PageID.91.) The parties further described the Five Settled Sites on Exhibit B to the Settlement Agreement. "Five Settled Sites," including Bloomfield, involved a comprehensive release of all coverage claims for all times. (*Id.*, Ex. 9, PageID.95.) The parties described the Bloomfield Site:

> The McGraw-Edison Battery Products Plant facility located in Bloomfield, New Jersey and anything released, escaping, or migrating or allegedly released, escaping, or migrating from the site including contamination of the groundwaters of the State of New Jersey as described in the Counterclaim and Cross-Claim of McGraw-Edison dated April 28, 1986, Count III, Paragraphs 70 through 77.

(*Id.*, Ex. 9, PageID.123.)

In contrast to the Five Settled Sites, the Settlement Agreement also provided for a separate identification and listing of "Additional Sites" on which Cooper was "on notice" of potential environmental contamination claims. The Settlement Agreement included several stipulations regarding these Additional Sites but did not release potential claims related to them. The parties ultimately listed over 75 of these "Additional Sites" on Exhibit C to the Agreement. The listing does not include any site in Bloomfield or Belleville, New Jersey, or any other place that can fairly be read to encompass the two battery operations straddling Bloomfield and Belleville.

The insurance companies argue that the "Bloomfield, New Jersey" reference in Exhibit B encompasses the entirety of McGraw-Edison's historic battery manufacturing operations in Bloomfield, including any related operations that happen to be geographically in Belleville, New Jersey – effectively the entire Silver Lake site as it pertains to Cooper. Cooper contends that the scope of the release is narrower than that and covers only the part of the Silver Lake site on which the primary battery division was located. The Court must now determine whether it should

4

exercise its jurisdiction to resolve the issue, and if so, what the scope of the release in the Settlement Agreement covers.

## BRILLHART ANALYSIS

Cooper first argues that the Court should refrain from exercising jurisdiction in this declaratory judgment action under *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491 (1942). The Court disagrees.

In *Brillhart,* the Court held that district courts have discretion regarding whether to exercise jurisdiction under the Declaratory Judgment Act. The Court explained that "[o]rdinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties." *Brillhart*, 316 U.S. at 495. The Court found that a district court presented with a suit under the Declaratory Judgment Act must decide "whether the questions in controversy between the parties to the federal suit, and which are not foreclosed under the applicable substantive law, can better be settled in the proceeding in the state court." *Id.* *Brillhart* did not provide an exclusive list of factors for a district court to consider in determining whether to exercise jurisdiction, but instructed that a district court should examine "the scope of the pending state proceeding and the nature of the defenses open there." *Id.* This inquiry involves consideration of "whether the claims of all parties in interest can satisfactorily be adjudicated in that proceeding, whether necessary parties have been joined, whether such parties are amenable to process in that proceeding, etc." *Id.*

The Sixth Circuit has identified five factors for district courts to consider in deciding whether to exercise jurisdiction over a declaratory judgment action. *Western World Ins. Co. v. Hoey*, 773

F.3d 755, 759 (2014) (citing *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)).  These factors are:

> (1) Whether the declaratory action would settle the controversy;
>
> (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
>
> (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for res judicata;'
>
> (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach upon state jurisdiction [which is determined by asking]
>
>> a. whether the underlying factual issues are important to an informed resolution of the case;
>>
>> b. whether the state trial court is in a better position to evaluate those factual issues than is the federal court;
>>
>> c. whether there is a close nexus between underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action; and
>
> (5) whether there is an alternative remedy which is better or more effective.

*Id.* (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008)).

The *Western World* court observed that "the Grand Trunk Factors and their cousins in other circuits direct the district court to consider three things: efficiency, fairness, and federalism." *Id.* (citing *Sherwin-Williams Co. v. Holmes Cty.*, 343 F. 3d 383, 390-91 (5th Cir. 2003)).  The Sixth Circuit does not assign any particular weight to the factors considered in the abstract; "the factors are not, of course, always equal." *Id.* "The relative weight of the underlying considerations of efficiency, fairness, and federalism will depend on the facts of the case.  The essential question is

always whether a district court has taken a good look at the issue and engaged in a reasoned analysis of whether issuing a declaration would be useful and fair." *Id.*

Here, the *Grand Trunk* factors weigh in favor of exercising jurisdiction. The parties themselves anticipated the potential need for resolving disputes over the Settlement Agreement and expressly provided that this Court was the appropriate place for resolving such disputes: "Enforceability of this Agreement and/or any dispute arising over the terms of the Settlement Agreement and Release, including any litigation, shall be commenced and resolved in the United States District Court for the Western District of Michigan, Southern Division." (*Id.*, Ex. 9, PageID.104.) When the parties themselves specify the forum for resolving disputes, and the Court then accepts that by incorporating the Settlement Agreement into the ultimate Order of Dismissal, no party is in a position to complain about the fairness of proceeding here. To the contrary, opening up interpretation of the agreement in several potential alternate forums creates the risk of inconsistent interpretations of the Agreement, and effectively deprives unconsenting parties of a part of their bargain. Keeping interpretive issues to a single forum chosen by the parties ensures consistency across all parties.

Other factors also weigh in favor of handling the issue here. The declaratory action would resolve a discrete aspect of the broader controversy the parties are litigating in New Jersey. Establishing the scope of the released Bloomfield Site under the Settlement Agreement would clarify usefully the legal relations in issue in the New Jersey litigation. The use of a declaratory action would not increase friction between state and federal courts, because this Court can determine the meaning of the Bloomfield Site under the Settlement Agreement without making any determination concerning New Jersey law, or any of the issues before the New Jersey Court. The New Jersey Court

is in no better position to evaluate any factual issues – should there even be factual issues – concerning the interpretation of the Settlement Agreement. Fairness, federalism, and efficiency all counsel exercising jurisdiction over the declaratory action regarding the Settlement Agreement in this Court.

## THE SCOPE OF THE RELEASE

### A.     Legal Standards

Michigan law governs the merits of this contract dispute. The primary purpose of contract interpretation is to enforce the parties' intent. *Burkhardt v. Bailey*, 260 Mich. App. 636, 656; 680 N.W.2d 453 (2004). In ascertaining the parties' intent, courts interpret "the language of the contract in accordance with its plain and ordinary meaning." *McCoig Materials, LLC v. Galui Const., Inc.*, 295 Mich. App. 684, 694; 818 N.W.2d 410 (2012). "[C]ontracts must be construed so as to give effect to every word or phrase as far as practicable." *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 467; 663 N.W.2d 447 (2003) (internal quotation omitted). If the contractual language is unambiguous, courts will enforce the terms of the contract as written. *Frankenmuth Mut. Ins. Co. v. Masters*, 460 Mich. 105, 111; 595 N.W. 2d 832 (1999).

### B.     Analysis

The analysis begins with the contract language itself. The Settlement Agreement specifies "Five Settled Sites" and describes each Settled Site in Exhibit B. Under the heading "Bloomfield, New Jersey," Exhibit B states:

> The McGraw-Edison Battery Products Plant facility located in Bloomfield, New Jersey and anything released, escaping, or migrating or allegedly released, escaping, or migrating from the site including contamination of the groundwaters of the State of New Jersey as described in the Counterclaim and Cross-Claim of McGraw-Edison dated April 28, 1986, Count III, Paragraphs 70 through 77.

8

(Coffey aff., docket # 343, Ex. 9, PageID.123.)

Paragraphs 71 - 74 of the Counter-Claim and Cross-Claim of McGraw-Edison dated April 28, 1986 form the heart of the description referenced in Exhibit B of the Settlement Agreement. Those paragraphs state:

71. **Since 1959 and prior thereto**, McGraw has owned and operated its Battery Products Plant in Bloomfield, New Jersey wherein it engaged in the manufacture of battery products, utilizing mercury and molten zinc in that process.

72. Waters which apparently contained mercury, zinc and possibly other contaminants were introduced into settling ponds on the Battery Products site at various times after 1959, and allegedly entered the groundwaters of the State of New Jersey on various occasions thereafter without the knowledge or intent of McGraw.

73. **In 1984 the New Jersey Department of Environmental Protection (NJDEP) ordered McGraw to investigate possible sources of contamination at the Battery Products Plant.** In compliance with such demand from the NJDEP and in an effort to defend itself and to mitigate damages, in 1985 McGraw undertook an investigation of such contamination and developed a proposed remediation program at a total cost to date in excess of $155,000. The cost of implementing the proposed remediation program is undetermined but is estimated to be in excess of $1,000,000. McGraw is awaiting response from the NJDEP on its proposed remediation program.

74. The claims asserted by the NJDEP concerning McGraw's responsibility for contamination allegedly from its Battery Products Plant in Bloomfield, New Jersey and McGraw's liability with respect to such site are based upon an 'occurrence' or

>'occurrences' or 'accident' or 'accidents' within the meaning of the Policies, are claims for 'property damage' within the meaning of the Policies and are otherwise covered by the Policies.  **McGraw is entitled to a judgment of damages and a declaration of its right to receive defense costs and defense and indemnification under the Policies for any and all liabilities that have been imposed and may be imposed upon it and the costs it may incur.**  Wausau, Commercial Union, and the Other Insurers are, with respect to each of the Policies subscribed by them, jointly and severally liable . . . to defend and indemnify McGraw for any such liability, including all expenses McGraw has incurred to date.

(Coffey aff., docket # 343, Ex. 1, PageID.065-66.)  (emphasis added)

Under the heading "Additional Sites," the Settlement Agreement provides:

> In connection with this Agreement, the Settling Parties have required Cooper to disclose all McGraw-Edison sites in addition to the Five Settled Sites, with respect to which Cooper is 'on notice' (hereinafter defined) of any Environmental Claim. Accordingly, Cooper represents that Exhibit C attached hereto identifies the Additional Sites as to which Cooper is on notice regarding any Environmental Claim.
> . . . .
> Cooper represents that Exhibit C, prepared by its representatives and attached hereto and made a part of this Settlement Agreement and release, identifies all McGraw-Edison sites with respect to which Cooper presently is 'on notice' of any Environmental Claim.  'On Notice' is defined as within the knowledge of Cooper's officers, risk manager, and/or any other senior executive involved in environmental affairs.

(Coffey aff., docket # 343, Ex. 9, PageID.98-99.)  Exhibit C mentions neither the Silver Lake site nor the plant at Belleville Avenue and Sherman Avenue.  (*Id.* at Ex. 9, PageID.123-124.)

The overall purpose of the Settlement Agreement is plain from the text: the parties wish to identify fully all known exposures by site, and then divide those exposures into settled and released exposures (specified on Exhibit B) and "on-notice" exposures (specified on Exhibit C).  In the

10

context of the Settlement Agreement, the only fair way to read the settled and released site in Bloomfield, New Jersey, specified on Exhibit B, is as a reference to all McGraw-Edison operations in Bloomfield, including past and future operations. The Bloomfield complex was a geographically contiguous operation, a kind of McGraw-Edison industrial park, that was operationally linked. Like most environmental sites, it was functionally connected, because groundwater does not respect surface boundaries. Had the parties intended to limit the scope of the release to only a portion of the Bloomfield complex, they could have done so and specified the remainder of the complex as an "on-notice site" on Exhibit C.[4] The absence of any reference to any portion of the Bloomfield operations on Exhibit C supports the conclusion that the parties intended the Bloomfield Site to encompass all McGraw-Edison operations in Bloomfield – the Silver Lake site as the USEPA is applying it to Cooper.

Further indication the parties intended a broad release includes the description of the site in the Counterclaim and Cross-Claim the language of the Settlement Agreement to which the Settlement Agreement refers. That description notes that McGraw has owned and operated its Battery Products Plant in Bloomfield "[s]ince 1959 and prior thereto." (docket # 343-1, PageID.065-66.) If the parties had intended to exclude the part of the battery manufacturing plant sold in 1960, there would have been no need to refer to 1959. The underlying New Jersey regulatory proceedings beginning in 1984 and referenced in the Counterclaim and Cross-Claim addressed McGraw-Edison's entire historic operations in Bloomfield and Belleville. (*Id.*, Ex. 29, PageID.710-716.; Ex. 38, PageID.773.) That the parties referred to this regulatory proceeding further buttresses

---

[4]The undisputed record reflects that NJDEP had put McGraw-Edison and Cooper on notice as to potential environmental contamination claims linked to the entire Bloomfield complex well before the execution date of the Settlement Agreement. (*Id.*, Exs. 31, 32, 34, 35, 37, 38, 39, 41.)

the conclusion that they intended the Bloomfield Site to encompass all of the historic operations at the complex.

Cooper seeks to draw a distinction between the primary battery division, situated at 75 Belmont, and the storage battery division, situated at Belleville Avenue and Sherman Avenue. Cooper contends that the release applies only to the area where the primary battery division was located, and that Westchester is liable for coverage for claims arising out of the EPA action as to the rest of the Silver Lake site, including portion of the site where the storage battery division was located. To support this argument, Cooper isolates the phrase "Battery Products Plant" in the Settlement Agreement and says it must mean not simply "battery products," but the particular real estate parcel owned by "Battery Products Inc.," a wholly-owned McGraw corporation formed in 1985, approximately a year after the initial NJDEP notice to McGraw about contamination at the battery manufacturing facility. Battery Products Inc. may have been formed, at least in part, as an effort to encapsulate and limit environmental and other exposure into a new entity. Indeed, McGraw engaged in an ultimately unsuccessful effort in the New Jersey courts to confine the regulatory reach of the NJDEP to the geographical boundaries of the newly created corporation. Cooper is attempting something similar here – trying to equate the term "Battery Products" with the metes and bounds limits of real property owned by a wholly-owned subsidiary initially created in 1985, rather than accept what the term more naturally meant to both New Jersey and McGraw in the 1985 notice letter: namely, a reference to the overall McGraw complex in Bloomfield that happened to include an alleged source of contamination tied to battery manufacturing in one location in the complex.

The Court has already described why, looking at the Agreement as a whole naturally leads to the conclusion that the Bloomfield site release covers the entire Bloomfield complex, not just one

segment of it. But even looking narrowly at the isolated phrase upon which Cooper relies demonstrates that the argument must fail. The first and most obvious problem is that the term the parties used is not the phrase that Cooper wants it to be. The parties referred simply to "Battery Products," and not to "Battery Products, Inc." The term is capitalized, but not defined anywhere else in the papers, and so the term must glean meaning from the overall context of its use. Reading into the term the corporate entity limits that Cooper urges is not warranted by the text or context. Second, the most natural referent for the term "Battery Products" is the 1984 notice letter, which is the triggering event for coverage purposes. And at that time the corporate entity "Battery Products, Inc." did not even exist. Moreover, the full extent of where the alleged contamination event would or could lead was not known, and could not be known, perhaps for years. That is why McGraw-Edison sought protection in its 1986 cross-claim for all liability that could ultimately be imposed, not just the particular $100,000 that was the subject of the initial response to the 1984 letter, and that is why the parties used the cross-claim, rather than the notice letter only, to define the scope of the Bloomfield Site release. And third and most important, the overall point of the whole settlement was to prepare a comprehensive identification of insurance exposures, and then divide them by site into released sites or on-notice sites. Reading the Agreement as Cooper urges would disrupt that design by effectively creating a third possibility: namely, a site that everyone knew was contaminated, and that the parties described in 25-year-old language on either the "Settled Site" or "On Notice" site exhibit, but that parties today are now describing in somewhat different words. On this record there is no basis to do so. The site referenced by USEPA in the New Jersey lawsuit today as Bloomfield, Belleville, or Silver Lake are all describing the same thing: namely, the Bloomfield Site released in 1989.

## CONCLUSION

For all of these reasons, the Court concludes that the Bloomfield Site as described in the Settlement Agreement and the Silver Lake site at issue in the New Jersey litigation are one and the same. Under the Settlement Agreement, all potential McGraw-Edison insurance coverage claims for environmental contamination arising out of the two battery plants McGraw-Edison used to operate on the Bloomfield Site have been released.


Dated:      January 27, 2016              /s/ Robert J. Jonker
                                          ROBERT J. JONKER
                                          CHIEF UNITED STATES DISTRICT JUDGE